Mr. Burrell, is it? Yes, Your Honor. At the right time, whenever you're ready. 24-2316. Oh, is it 2316? I'm sorry, I have the wrong number down. 2316, my bad on my bench book. All right, Mr. Burrell, whenever you're ready. All right, good morning, Your Honors, and may it please the Court. My name is Tyler Burrell with the law firm McCumber, McCumber & Luber. We represent the appellant. I'd like to reserve three minutes of my time for rebuttal, please. Great, thank you. The plaintiff here has standing because, as alleged, Rutgers schemed to hire graduating MBA students who did not have employment back into their program in order to inflate its rankings. As a result, the plaintiff suffered an ascertainable loss because he paid tuition, had a contract, and did not receive the benefit that he bargained for. Was he enrolled in the full or part-time MBA program? He was not enrolled in the full or part-time MBA program. He was enrolled in the Masters of Science supply chain, and he also earned a mini-MBA certificate. In connection with this, that was an MBA certificate for an online program? Rutgers has what's called a mini-MBA program that they've trademarked and reserved, and they mark it as a certification instead of a full MBA program. So your complaint's allegations are fairly sketchy. You say you didn't get the benefit of the bargain, but you don't pin down what the theory is on which you didn't get the benefit of the bargain. That's what I'd like to know about. What is the subject of the bargain your client didn't get? Are you going to plead something about the ranking or future value or quality of education? Which is your focus? The idea here in the damage is that the plaintiff did not get the benefit that he bargained for in a top-flight graduate business program. Rutgers marketed the program. Top-flight meaning that the ranking is inflated or the actual value of the education is inflated? Well, I think there's two parts to that, Your Honor, if I may. One, that the ranking is inflated because of the fraudulent scheme we alleged. And as a result of that, the rankings would have been different. The rankings would have been different. So that's the focus of your benefit of the bargain. Yes, the rankings would have been different. It's not that his classes are any different than they would have been otherwise. No, the classes aren't different, the program's not different. You're not claiming anything about those being different. No. Okay. And so you're not claiming anything about the future value of the diploma independent of the rankings. This is all through the rankings. Yes, he did not get the benefit that he bargained for. And the theory here is exactly what's happening in the Columbia case and exactly in FAVL, which is in our reply brief in one of the footnotes, but FAVL. So which ranking are we talking about? Is it really U.S. news rankings that is what you're focusing on and pleading? That's what's in our pleading. That's what was alleged was the scheme to hire back the students. They submitted employment stats that said. Have they fallen? The rankings have not. Well, we haven't pled that the rankings have fallen, but a cursory review online in front of this government will flesh out they have fallen. You have not pled it, but you could plead it. We could plead it. All right. And it's the U.S. news rankings that were falsified because of the employment numbers. You're not saying that Bloomberg or Fortune or anything else wound up being inflated as a result. But we do believe from the Discovery World flesh out that Financial Times was also inflated because they use employment statistics as well. You think you could plead Financial Times and U.S. news. So did your client find, if you had to plead it, what would your client say about any kind of reliance on U.S. news or Financial Times? Did your client see those ahead of enrolling, both of those? We've had conversations with our client that he viewed the website. I think it's important that he went on the Rutgers website. Rutgers markets these statistics and the rankings to all the prospective students. There's a whole website page that has every year all of the rankings, and that's marketed to all of the students. Did your client say anything specific about, I saw the Financial Times ranking? Well, we've alleged that he relied on those rankings because he believed the school was ranked high, and that's the reason why he wanted to go to that school. He wanted the value. Something that included the Financial Times ranking as well as the U.S. news ranking? Yeah, I believe we allege that, Your Honor, but I also want to warn you. You could. Yeah, of course we could, but reliance is not required under the CFA. I understand. How does the ranking of the full-time MBA program affect your client, who wasn't even in a part-time MBA degree program? He was in a certificate program. How would you connect those things up? That's a great question, Your Honor, and there's a simple answer for that. One, the rankings, we have alleged in our complaint, paragraph 207, that the rankings impacted all three graduate programs. MBA's program ranking influences the value of the MBA full-time, the part-time, and the Master's of Science. The idea is that this is a business graduate school, right? The pinnacle of a business graduate school is the MBA program. That's why you have a business program, right? So that inflates the value of the whole school. There's a mini-MBA cert that our client also got, right? And those two are tied. If the MBA itself is not great, why would anyone go purchase the mini-MBA? It's almost like law schools. It's like if you get an LLM from a top-rated law school, you sit there and say, well, gee, no, that's not a JD. No, you still get the benefit. You're basically saying, you know, we aren't going to fixate on precisely the program because it's the overall reputation of the school. And didn't Financial Times kind of rank the school generally, not the program? Or did I have that wrong? Is it one of them that ranked the school generally, not program by program? Yeah, if you go on our complaint, we have a screen part of the website. The rankings are extremely complex in that they dice them a bunch of different ways. One ranking says it's the top public school in the tri-state area. Then one ranked the top public school in the East Coast. You can slice and dice it any way you want. But the idea is the original sin was the fraud that we have alleged, right, that ultimately inflated. The fraud inflated their employment statistics. And a result of that inflated their rankings. Students go to a top flight graduate school program because of the rankings, right? They're induced to go to that program. And they didn't get what he bargained for. He got a degree. Nobody disputes that. He got a degree. But it wasn't what he bargained for. It wasn't what? He got a degree in Masters of Science in supply chain and also the mini MBA cert. How do you tie the inflated value of full-time MBA, inflated ranking of a full-time MBA, to his decision to enroll in the certificate program? What do you plead and what could you plead about that? Well, we do plead that the rankings, we do say the MBA program ranking influences the value of the MBA, full-time, part-time, cert program and the Masters of Science degrees. But the key here is, I want to go back. I mentioned earlier about FAVL, right? FAVL is in California versus USC. It's a similar case about fraudulent statistics that were submitted to U.S. News, right? And ultimately in that case, all of these questions that are being brought up are fleshed out in discovery. There's an expert that takes a look at what would the rankings have been if they were not, if the accurate data was submitted, the adjusted ranking. And then an expert determines that. And they would have been lower. Yes, yes. And if given a chance to amend, could you plead that they have, in fact, dropped? Yes, we believe, of course, we want to be sure they have dropped. Let's go back, let's do a timeline here. When did, when was he, he first said that, this goes back to what, 2018? Or when did he, when was he a member? That's when he filed the first suit, right? 2018 was when the fraud took place and that was the year we elected him. Because you said the U.S. News and World Report rankings since then have not fallen. So did they fall in 2019? We do have, I mean, we haven't pled exactly in the complaint. The question is, did they fall in 2019? They did not fall in 2019. Did they fall in 2020? No, I don't believe so.  No, I did not have that number. 2022? No. When did they fall then? Well, I mean, based off the information we have on publicly available sources, we have to get into the private facts of this, but in 2024 and 2025, U.S. News, it dropped approximately eight points. The year before it was 45. It was ranked, now it's 53. Financial Times, it didn't rank in one year, but in 2024 it dropped from 69 to 86. But the idea is not that, I think it's incorrect to look, did the rankings drop? Because at that point, at the pleading stage, we're making a merits determination, right? So, ultimately, we need to get into discovery and flesh that out. And that's what's happening in FABL. It's no different than FABL. Yes, John. You also say your client paid a premium price. He would have selected a different, cheaper program. But you don't say anything about that. Are there other programs he was accepted to that he would have gone to? Do you have a specific program? We can compare the cost of that program with the cost he paid for this program. Yes. He did look at two other schools. I don't have that answer off the top of my head. We can plead that. We can plead that. We know. We can get our client to tell us which school. One of them I know was- I do not know whether he got into a different program. I'm standing here today. I do not know. But I know he looked at us. You might or might not be able to plead that. And you might or might not be able to plead that that other program was cheaper. But you, in the complaint, and to your knowledge, don't have that information. I don't have that knowledge. But if I may, Your Honor, I think it doesn't matter what other schools he would have went to or not. The idea is that he didn't get the benefit that he bargained for. And if I can make a quick analogy, the Campbell suitcase comes up a lot in these consumer fraud class actions. This is really what it is, right? But the premium price theory doesn't work for that one. Yeah, it doesn't. Banking's inflation is a different one. But you're admitting there is nothing in your complaint that supports a premium price theory. Yeah, and we don't plan to move forward with a premium price theory. Yes. The benefit of the bargaining is the damage model we seek to move forward. And that was his agreement in what they're working for in foul.  It just simplifies the case. Finally, I want to ask you about the future yield of the degrees. Where did Rutgers make a representation about the future yield of his degree? And how has it changed negatively? What do you mean by future yield in terms of? I thought your brief referred to what the future yield of your degree would be. Well, I. You don't have anything. Nothing independent. Your case is really standing or falling on the rankings. It's really standing on it. He didn't get the benefit that he bargained for. And I'll go back to the Campbell suitcase. The benefit. It's not employment. It's a rankings and then the value of those rankings going forward. Yeah, but we don't. Yes. Some of those rankings include employment, employability. And some of the key fraud here is that they inflated the employability part. So when you want to talk future yield, isn't it? Don't the rankings kind of begin to account for that by accounting for likelihood of employment? Well, part of the rankings look at the employment statistics of 20 to 30 percent depending on the year. It's not an independent theory of liability is what I'm saying. Yeah. The rankings misled your client. That's a future value. It's not an independent of ranking series. If the rankings are inflated, if they fell, then you can infer that. But you have it. You're not pleading anything independent of the rankings on that. It's not independent. But I don't think they even need to fall in the future. The discovery will show us that at that time and we'll have an expert that would say, you know, if accurate data was submitted, this is what the rankings would have been. And then that. All the only theory is you having conceded the other stuff. The only thing is you have all go via rankings, inflation and overstatement. Yes. Yes. Let's talk about Perot. You lean on that a lot. Yes. What I want to say is that was a criminal case about deprivation of money from my wife. I get ranking fraud could deprive money. But you can be liable criminally for acting with a certain mental state. And it doesn't require a certain injury necessarily to flow from it. Right. Standing doctrine. Isn't that different? Standing. You have to talk about injury, in fact, and causation and redress ability and all of those things. So it doesn't follow that if Perot can be prosecuted, that necessarily that they're standing right. Even without a victim, the government can prosecute. Of course. The idea from the Temple case is that the defense point of, well, he got a degree. He still got a degree. He paid for his tuition. He got a degree and he got a job. That's not a defense point. You can't. They can't push the case aside with that. The idea is he didn't get what he bargained for. They marketed. They misled consumers to believe it was a top flight school based on their rankings that we allege are fraudulent. As well, he didn't get the benefit that he bargained for. But Perot also had one other wrinkle, which is the rankings went up with the fraud and then plummeted. From 1 to 41. Students who had picked the school because of the ranking. Right? Yes. Here, you haven't alleged it. Now, you've just told us now that it was 2024, I think, the rankings dropped. Yes. Before all this. So on the current state of the pleadings, there's a deficiency. Now, you should have a chance to amend that, you're saying, because you can come back and plead some civic facts. But on the current state of the pleadings, this case is distinguishable from Perot. Yes. Well, I think, again, we go back to it is different in that the rankings in Perot and even in Columbia drop. And in Favreau as well. But the difference there was that the schools admitted they were wrong. And either the U.S. knew, sanctioned them immediately and pulled them from the ranking system. Or the school itself said, hey, we did something wrong. We're going to withdraw ourselves. So naturally, the rankings dropped. But the analogy here is in the consumer class, actually, in the Campbell suitcase. We don't have to wait for Campbell to say, yes, the soup doesn't have 25 percent less sodium. We're going to lower the price. We don't have to wait for the seller to change the price or adjust the rankings in order to have standing. It is true. You could also plead the it's inflated, the bubble's going to pop. And the moment that people learn about the fraud, it's going to deflate to whatever its natural level is. If you plead it that way, then you've got to prove it that way. Yeah. But ultimately in Favreau, what they're doing is they're not saying that in the future it's going to drop. The discoveries looking at it in the expert, which just survived the Dahlberg motion recently, is that, and it was just a class certification the other day. It was sealed so we can't see the underlying information. But the idea is that what the ranks would have been for that year in question. If accurate data was submitted to U.S. News, what the actual adjusted ranking would have been. And then the difference of that, they go out and then there's also an expert that goes out and goes to malls and talks to people and sees, you know, what's the value of that difference, right, whether it's 2, 10, whatever. And then that is the damage model for us. They didn't get the benefit that they bargained. And your question is, is that concrete enough for standing? There's a host of cases in the District of New Jersey that say that is concrete enough. Benefit of the bargain is a concrete enough injury. There's the Favreau case, BMW, Mercedes-Benz. And Marcus V. BMW tells us, the Third Circuit, that, yeah, I see my time is up. So is there any other questions? You say that you're not espousing a premium price theory. So that means that you're not saying that the tuition was inflated by the alleged rankings. Yeah, that's not the damage model we seek. You're not saying that he would have attended other schools for less money because we don't know that. We don't know that at the moment. The idea is that he didn't get the benefit that he bargained for, which is a cognizable damage model that's been recognized by the Third Circuit. You've got an amended complaint here, right, after? I'm sorry, can you say that again? You've got an amended complaint? Yes, we've amended the complaint twice. And so you're not saying that enrollment changed based on the alleged rankings inflation? No, enrollment. The school would get more money by virtue of more people enrolling. Well, I mean, of course, the idea is that they're misleading the market. That's what the Consumer Fraud Act statute is, a protective statute. The idea is that they've misled the market in deceptive marketing. Ultimately, it drives more students to their school. Of course, you're going to want to go to a better school if you have the opportunity to. They're inducing and marketing that to students. If the rankings didn't change in the year or two years or three years or four years afterwards, and you're saying you're not basing your complaint on some type of pricing or monetary injury, and he wasn't in the program to begin with, what do you have to stand on to say that you have standing? That's a bad question. What do you have to bolster that you have standing? Yeah, if I may real quick, the first thing to note is that when the statistics are submitted to U.S. News, that employment data is good for three years. So even if the new data is submitted, it's going to take time for that ranking. If you want to follow, the ranking needs to drop, even though I think that would be the incorrect merits determination. But it takes time for that to happen because of the three-year period. The parodic went from 1 to 41 pretty quickly. I'm sorry? The parodic went from 1 to 41 very quickly. It was because U.S. News sanctioned him immediately, and he was also indicted. In those cases, in Temple, in Columbia, in Farrell, there was a public outcry first. The schools jumped on top of it. Here, Rutgers has not done any of that. We had a whistleblower that was involved in an underlying case. That's where the fraud information comes from, and Rutgers didn't admit to the unlawful conduct. We allege it, at least not yet. But we have standing. To get to your point, as we allege that the MBA program rankings impact the value of this program, Rutgers uses these statistics to market to students for all their prospective students, and they don't view them in a silo. And then I want to also note that nine of the ten courses in the MBA supply chain course overlap with the MBA program. I'll say that again. Nine of the course, nine of the ten of our plaintiffs' courses overlap. And you have a question, Your Honor? That's it. All right, great. Thank you, Your Honors. I appreciate it. Good morning, Your Honors, and may it please the Court. My name is Jeffrey Seuss, and I represent Rutgers in this case. This is not the first time the plaintiff has had an opportunity to espouse whatever facts or theories it is he would like to put forth in support of his claims. There have been three pleadings already. The initial pleading that the plaintiff filed, we moved to dismiss. The plaintiff then amended as of right without even opposing our motion. At that point in time, we went through a full briefing, and the district court ruled on the amended complaint. You said the amended complaint, but we should, the district court should grant leave liberally unless it's futile. And your friend on the other side has suggested some things. Would it be futile to amend the complaint to suggest the rankings were inflated and have dropped? I would argue yes. It would not only be futile, but it would be inequitable. That is what the district court, in ruling on the second amended complaint, found when it decided not to grant leave to amend. And as an initial matter on that, the request to amend to file yet what would be a fourth pleading was not something that was requested in the briefing or was briefed. The plaintiff in the briefing is standing on the second amended complaint from what we can tell, and there has not been any application to amend. And the standard of review is different, as your honors well know, between ruling on a motion to dismiss for standing, which is plenary review, versus ruling on an amended complaint or on not granting leave to amend, which is abuse of discretion. And there is no abuse of discretion here by the district court in denying leave to amend after ruling on the second amended complaint, which was the plaintiff's third pleading. So, you know, getting to the nuts and bolts of Article III standing, as I understand Article III, it applies to federal courts, federal courts when they hear civil actions, federal courts when they hear admiralty actions, federal courts when they hear criminal cases. It's all cases and controversies. Correct. And so if they're standing in parat, there has to be, because it's a criminal case, no one threw that out for lack of standing, why wouldn't there be standing in this case? If they're standing to bring criminal charges, and that obviously is going to meet whatever test for standing there is, doesn't this case clear standing as well? It does not because there is not this traceability of the alleged injury to the plaintiff. In parat, you actually had not just a change in the rankings, but you had student testimony about reliance on the rankings and the impact on them of the drop in the rankings. You don't have any of that here. What you have is a subjective belief by the plaintiff that because he believes that there was some fraud, and let's look at what the fraud is, it is limited to one time period, 2018, six students who he claims were misreported in the U.S. News and World Report's data for only the full-time MBA program, not the program that the plaintiff actually attends. The plaintiff has not suffered a concrete harm that is particularized or personal to him because he was not in that program, and as the court has already observed in questioning my adversary, the rankings have not changed. The second amended complaint actually reinforces that. When you look at the exhibits that the plaintiff attaches to his complaint, and your honors have that in the appendix, you will see that it starts with 2017 and goes all the way up through the 2022-23 time frame. He attaches both the part-time MBA and the full-time MBA. It doesn't attach the part-time Masters of Science in Supply Chain Management that he was actually enrolled in or the MBA certificate program, but when you look at those rankings, they were the same before the alleged fraud occurred in 2018 because Exhibit A to the complaint, and I believe it's Exhibit G, which starts with the full-time rankings, start in 2017, and then it carries it forward year after year, and you can see the rankings stay the same. So even with 2018, 2019, when the plaintiff actually enrolls, right on through. So this seems to – your theory of lack of causation seems to require like an immediate response to alleged fraud. There's a lot of fraud, and then there's a – or very close, but I mean we know from the securities fraud context that sometimes, you know, the security plaintiff lawyers come, and they're always trying to argue – they want usually the biggest window they can. They want to say the fraud happened here, and it continued for this long, and the stock stayed high, and they want that huge window because that gives them as many possible plaintiffs and as much possible monetary recovery. And so if we look at that, and that's a very common area of fraud, we know that sometimes there can be a huge delay between when fraud happens and when you see a change in market-based valuation, which is I think equivalent or at least similar to the rankings here. So I mean the plaintiff lawyers in the securities context are telling us that, yeah, the stock stayed high for as long as possible. Our fraud case is stronger. And now here the answer is if the rankings stay high for as long as possible, the fraud case is weaker. Can you walk me through that a little bit of an incongruity? Well, what I would say is you have the alleged fraud occurring in 2018. We're here in 2025. There still hasn't been any – certainly it hasn't been pled. And again, we have to look at what has been actually pled. So when you talk about, you know, it hasn't been pled, you know, down in the weeds of the Federal Rules of Civil Procedure as in like Rule 15D, they make a difference between amending and supplementing. And amending is when you want to go back in time and say, hey, as of the date of my pleading, this is the state of the world. And then supplementing is, hey, something after the date of my pleading just now occurred. And so the liberalness and the standards for amending are there, but if someone comes with a supplement request and says, I've got new information, shouldn't we give that a slightly different look, especially when it's so core to the claims? If that were something that had been requested, but it hasn't, and so we're left with the situation where I'm hearing about allegations that could be pled, but yet these are not new. The world hasn't changed, at least in terms of what the theory is on the rankings, since 2022 when the complaint was filed. The plaintiff has had opportunities along the way to make whatever changes needed to be made. This is not new information, I guess is the point, which could not have been presented previously in an amended, an application to amend. And we're still left with the situation of there's been no application at this point in time to amend, and it is an abuse of discretion standard. And I would submit that the district court did not abuse its discretion in saying, after three opportunities, enough is enough. It isn't equitable to continue to perpetuate this case after three years if you haven't been able after three times, including one opinion by a previous district court judge who basically presented a roadmap of how to go about fixing the deficiencies in standing. In addition to the arguments that we had been raising since the very outset, the plaintiff had not only the benefit of our brief on the first motion, but on the second motion, which was fully briefed, they had the benefit of our response to their opposition. Then they had the benefit of a district court's opinion setting that roadmap, but they didn't follow the roadmap. And now they come in and they say they have this other information they'd like to plead, but this is not information that is new. This is information that has been there all along. So there cannot be an abuse of discretion, I would submit, at this point in time, which would allow what would be a fourth bite at the apple on this particular issue. I mean, your point has a certain resonance in the sense that you move to dismiss, you put your best arguments out there. They got a chance to. And they haven't changed. And they got a chance to fix everything based on your best arguments. Correct. And then best arguments prevailed in district court. First, they got a chance to see how they prevailed with a roadmap. And then they amend again, and once again, and again it's two different district judges have looked at this carefully and considered it and have found that there's this disconnect between the fact that you have a plaintiff in one program, a part-time specialty master's of science program, pointing to allegedly fraudulent data in a completely different program in only one year, and you have the rankings which have stayed the same throughout. And so we're told, and I think there's no reason not to credit, appear to have changed since the most recent ruling. Well, again, now we are, what, six years out from when the alleged fraud is the ranking. But let me go back before that. What is the difference between an MBA degree and an MBA certificate of attendance online? Well, the MBA degree, full-time MBA degree, is a degree that you are attending on a full-time basis in person. The MBA certificate is online. It is not an actual degree. You don't get a diploma. This is a fully online program? I don't know for sure if it is fully online. How segmented are these markets? Are people, like, considering one or the other? Are they completely different pools of consumers? I would submit that they are clearly segmented because why else would you need separate rankings for all of these various programs? Is there a separate ranking for certificates? I don't know about the certificate. There is certainly a separate ranking for the Masters of Science part-time specialty. Yes, like full versus part-time MBA, not a separate ranking. Part-time MBA versus full-time MBA, yes, there are. That's not only separate. What was allegedly inflated here? Full and part-time? Full-time. The only data he points to is the full-time MBA program in 2018. Six students who they claim the employment outcome data was misreported. And that's only one aspect of what the organizations collect, one metric. There's a separate part-time ranking, yes. There is. There is. There is separate part-time, separate part-time. Even the specialty master's programs. And you can see that in our briefing. And one of the things that the plaintiffs point to in their complaint is the website for the CSEA, which is the standards organization, which sets the standards for how you collect and report data. And they have separate standards for each of these different programs. So the market clearly is segmented enough such that not only does the standards organization deem it necessary to provide separate guidelines for the different programs, but then the various publications which report the rankings find it necessary to separately rank them because they know the consumer, the student, is discerning enough to want to see, for my particular interest, what I'm going for, where do things stack up. And that's where you have this disconnect between he was not in the full-time MBA program, yet that is the only alleged wrongful conduct he points to. And there is no allegation, nor has there ever been, that there has been any wrongful conduct in connection with either the part-time MBA program, which is separate, the Masters of Science in Supply Chain Management program that the plaintiff actually attended, or the MBA certificate program. So we are limited to just one area that has nothing to do with what the plaintiff actually attended. Your colleague on the other side, friend on the other side, said he would get expert witnesses if he had the opportunity at discovery to show what the rankings should have been. Six students might not have moved the rankings all that much, but if he had an expert that showed that the rankings dropped even by one point, wouldn't that be enough to show an injury in fact? Well, you have to first be able to make well-cluded allegations to establish that they did before you get to discovery. A hundred percent. A hundred percent. But let's just say that he said, oh, and by the way, I'm attaching my expert report who ran numbers, hypothetical numbers. We didn't get discovery, so we can't run the real numbers. But he says, you know what, six students, they dropped one. You could argue that maybe they would have dropped because another school just did better. There are a million arguments to kind of say why you dropped in the ranking. But if they said that, if he said I got one expert and the expert said that, that would be good enough for injury in fact, right? I disagree. I think you are still speculating about what would perhaps happen with respect to the rankings. Let's say the expert survived Daubert. He says there's an expert that survived Daubert, and so in order to survive Daubert, you can't be speculating. It has to be the product of reliable principles and methods. And so let's say he had one expert that said, yeah, the rankings dropped by one point. It survives Daubert. That would be enough for an injury in fact. It might be a very small injury in fact. The damage is probably might be tiny. But wouldn't that be enough for injury in fact? I would say no because you still have this disconnect between if he's going to be looking at just the full-time MBA rankings. We don't have any well-cluded allegations that the plaintiff saw, relied on, utilized them in terms of his decision-making process to go into a part-time specialty master's program. And I would also say that you still have a plausibility issue, which is is it really plausible to believe that the plaintiff who is not even attending a particular program would be utilizing a ranking that doesn't apply to the program he attends or that the role for conduct involves a data point or a metric that doesn't apply to him because he's not seeking employment from a full-time MBA program. He's in a part-time specialty master's program. And I see my time is up, so if there are any other questions. In 20, when did Mr. Burdett attend or get the certificate? He enrolled in the school in 2019. I believe the certificate was awarded in 2021. It is in the complaint. Okay. And what was the ranking in 2019? For which program? MBA program. The full-time MBA program. Again, the rankings are sliced and diced in a whole bunch of different ways. I guess the best analogy would be part-time. So what was the ranking for the part-time MBA program? The part-time MBA program in 2020. And 2019 when he came. 2019. And in which organization, which ranking? I said U.S. News and World Report. Okay. I do not believe the complaint pleads that particular information. So it's not of record. What is of record in 2019? What is of record in 2019 are the exhibits that you have to the complaint. And what it says is records was the number one MBA program in the tri-state area. And that's in exhibits A through G. And that ranking, did it stay the same in 2020? It stayed the same from 2017 all the way through 2022, which are the exhibits to the complaint A through G. That's the part-time MBA. What is the most recent ranking? What it is right now. What is the most, yes. I do not know. It's not something of record in this case. Thank you. Thank you.  Sure. That is correct. I believe so. They slice and dice them. Allegations. All you can allege is that the full-time rankings were inflated by the inclusion of these six students. Correct? You don't have a basis for alleging, let alone proving, that the part-time rankings were inflated. We don't allege the part-time rankings were inflated. The part-time rankings don't take a look at the employment stats because it assumes that people are already employed to go to part-time. Your case rises or falls on the full-time rankings. So the thrust of your friend's questions on the other side was that this isn't full-time and this isn't part-time. This is a certificate. But if we're going to allow you to analogize to anything, why analogize from the rankings and say that the full-time inflated rankings hurt your client, when, if anything, this product, the part-time rankings, would seem like it's closer to the certificate program than the full-time MBA. Your client wasn't anywhere near a full-time MBA program. Yeah. I think Rutgers wants us to take these things and view them in a silo. But that is not how we pled at one, and that is not how the real world works. Rutgers themselves want to be pled that the MBA program influences the ranking of all of the programs. We did plead the full-time MBA program. We did. Yes, we did plead that. It influences how consumers buy the part-time and the certificate. Yes, we do, and that's 207. Not if the part-time rankings are accurate. The full-time has a spillover effect. Yeah, so that's the preeminent. It's a graduate school business MBA program. You didn't plead that at all clearly, but you could plead that if given a chance? Yes, we could replead it. It's actually in the second amendment complaint, 207.  And what would you, if given a chance, would you add any detail or anything further on that? I'm sure there's always more we can add if given the opportunity, but I think some of the allegations already get us there. We also say in Paragraph 7 that the tainted rankings before the plaintiff would have selected a different program, which goes to causation. We allege in Paragraph 47 that the class members are heavily influenced upon Rutgers' rankings and statistics that they published online, and they would have considered other programs in making a decision. So I think on the aggregate, we've pled that. They make great defense points about was the ranking, was it actually fraud and all of that, but we have to get past the pleading stage and into discovery, as Judge Phipps mentioned. That's what's happening in FAVL right now on that. I think we've… Well, you said influence really influences the value. Consumers make decisions about part-time and certificate programs based on the full, in part at least, on the full-time MBA rankings. Yes. And you expect that during discovery, you could develop expert and other evidence to support that allegation. Yes, absolutely. And the Campbell's case, I go back to that. One of the sort of sub-elements of the Reliance Center is that the court can also look at the reasonableness of whether that influenced folks, and that's for discovery to flesh that out, right? Ultimately, this is Rutgers, the graduate school. It's marketing. It's disseminating this information. It's the premier sort of fact, right, that they're riding on as a business school, the preeminent one in the state, and that induces folks to go to their school. If I were your friend on the other side, I'd be a little annoyed. You had two district judges give you two amendments. They made clear. Your complaint is still maddeningly vague. I had to ask you a whole bunch of questions to figure out what was the benefit of the bargain that you lost here, what was wrong with it, and you just kind of wave your hands around, so to speak. Like I have to pin you down about it's these rankings for this, et cetera. Can you spell out more specifically if given a chance to amend? Can you say, you know, students make decisions based on this. They pay more for this. They turn down other programs. Of course. We can absolutely do that. I think we have some of those allegations there. We were given two times the course, which is not a course. My friend is understandably a little annoyed that you haven't done it. I think some of the ones I just read, I think they're in there. When you aggregate them all together, it gets us there. But also we want to get, you know, when you're making merits determinations about whether the fraud happened and all, that's the next stage of this. I think we've pled an ascertainable loss with the benefit of the bargain, and ultimately I want to remind the court one of my last points in my rebuttal here is that under Clemens' concurring opinion, which has also been adopted by the Fifth Circuit, the court, the district court did not, both district courts did not look, did not look at our contract claim and our unjust enrichment claim, which are self-evident confer standing because of the nature of the common law private right of action. And the district court did not look at that at all, at all. So we think that also confers standing for our case. Any other questions? Thank you very much. I appreciate your time. And kindly ask the court. I ask that the parties have a transcript prepared promptly and split the cost. We will go off the record, but before we do that, my custom is I'd like us to greet counsel at sidebar and shake your hands to thank you for coming to argue before us. Thank you, Your Honor.